
EOD
03/20/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CORNERSTONE PRODUCTS, INC., | § | Case No. 05-43533 |
| | § | (Chapter 11) |
| Debtor. | § | |

# MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court on the *Expedited Motion to Compel Stopol to Disburse Sale Proceeds and Provide Accounting* and the *Amended Expedited Motion to Compel Stopol to Disburse Sale Proceeds and Provide Accounting* (collectively, the "Motion to Compel") filed by Cornerstone Products, Inc. (the "Debtor"). The Court conducted a hearing on the Motion to Compel on May 1 and June 5, 2006. Based on the arguments and evidence presented at the hearing, the Court makes the following findings and conclusions pursuant to Federal Rule of Civil Procedure 52, as adopted and applied to this case by Federal Rule of Bankruptcy Procedure 7052.

## I. BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 5, 2005 (the "Petition Date"). The Debtor subsequently filed a plan in which it proposed to liquidate its assets. The Court entered an order confirming the *Second Amended Plan of Liquidation for Cornerstone Products, Inc., as Modified* (the "Plan") on February 16, 2006.

In November 2005, as part of the liquidation process, the Debtor discussed an

---

[1] This Memorandum Opinion is not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case, or other evidentiary doctrines applicable to the specific parties in this proceeding.

auction of its assets with Stopol, Inc. and/or Stopol Auctions, LLC ("Stopol"),[2] DoveBid, Inc. ("Dovebid"), and Plastics One. On November 11, 2005, DoveBid submitted a written proposal to the Debtor in which DoveBid proposed that it would be compensated for auctioning the Debtor's assets by charging purchasers a 13.5% "buyer's premium," with 4.5% rebated back to the Debtor. DoveBid's proposal did not include an additional commission or "seller's fee," that is, it did not propose that any percentage of the sales price would be paid by the Debtor to DoveBid.

On November 14, 2005, Neil Kruschke, the Chief Executive Officer of Stopol, Inc., provided the Debtor with a written overview of its auction services. The written overview stated that Stopol would require a 10% "commission fee" to cover its auction costs. However, Mr. Mahalik, an auctioneer for Stopol, testified at the hearing on the Motion to Compel that Stopol agreed to a discounted fee of 5% to be paid by the Debtor from the gross proceeds of the auction.

The Auction/Liquidation Agreement proposed by Stopol did not expressly provide for a buyer's premium. Nonetheless, Mr. Mahalik testified that Stopol intended to charge a "buyer's premium" as part of its usual and customary procedures. Paragraph 2(A) of the proposed Auction/Liquidation Agreement stated that Stopol would carry out the auction "in accordance with [Stopol's] usual practices and procedures . . . ."

The Debtor selected Stopol as its auctioneer. The Debtor and Stopol signed an

---

[2] Stopol, Inc. and Stopol Auctions, LLC are owned by Neal Kruschke. Stopol, Inc., which Mr. Kruschke formed in 1990, buys and sells used machinery in the plastics industry; Stopol Auctions, LLC, which Mr. Kruschke formed in 2002, is in the business of auctioning plastic processing machinery. As discussed below, the Debtor and Stopol, Inc. eventually signed an Auction/Liquidation Agreement. However, the Debtor requested and received authority from this Court to employ Stopol Auctions, LLC – not Stopol, Inc. – as an auctioneer. As discussed in a post-hearing brief filed by the Debtor on July 17, 2006, the Debtor appears to have been confused by the common ownership and related nature of the two businesses as well as the first page of the Auction/Liquidation Agreement, which bears the names of both Stopol, Inc. and Stopol Auctions, LLC. For purposes of this Memorandum Opinion, however, the legal and operational distinctions between Stopol, Inc. and Stopol Auctions, LLC are not relevant.

2

Auction/Liquidation Agreement on or about November 18, 2005.[3] Pursuant to the Auction/Liquidation Agreement, Stopol and the Debtor contemplated conducting three phases of sales: (1) first, pre-auction sales of the Debtor's property; (2) second, an on-line auction; and (3) finally, a live auction. Pursuant to Paragraph 6 of the Auction/Liquidation Agreement, the Debtor was to pay Stopol a 5% commission on the gross proceeds from the sale of equipment and assets at or prior to a live auction. Paragraph 6 defined "gross proceeds" as "all revenue from the Sale of the Equipment and Assets or other item of property, excluding any sales taxes . . . ."

The Debtor filed an *Expedited Motion to Approve Sale of Personal Property* (the "Sale Motion") on or about November 21, 2005. In connection with the Sale Motion, the Debtor filed an *Expedited Application Pursuant to Sections 327(a) and 328(a) to Authorize the Employment and Retention of Stopol Auctions, LLC as Auctioneers/Liquidators for the Debtor* (the "Employment Application"). The Debtor thereby sought authority to employ Stopol to market and liquidate "the molds, machinery and equipment set forth on Exhibit "A" . . . along with other miscellaneous items of property such as furniture and computers (collectively, the "Property") as the Debtor may direct."

Mr. Kruschke, as the president of Stopol Auctions, LLC, executed an affidavit in support of the Employment Application. He stated in his affidavit that Stopol was "disinterested" within the meaning of 11 U.S.C. §101(14). However, at the hearing on the Motion to Compel, Mr. Kruschke testified that in mid-November 2005 (prior to the filing of the Employment Application), he and the Debtor's chief executive officer, Reggie Sullivan, orally agreed that (1) Stopol would buy some of the equipment listed on

---

[3] Paragraph 13(E) of the Auction/Liquidation Agreement contains an Ohio choice-of-law provision.

3

Exhibit "A" for approximately $3.1 million; and (2) Stopol would not be required to pay the Debtor for any of the equipment until it was re-sold by Stopol.

Following a hearing on December 1, 2005, the Court entered an *Amended Order Granting Expedited Motion to Approve Sale of Personal Property* ("Sale Order") approving the Sale Motion on December 16, 2005. Additionally, the Court approved the Application to Employ Stopol by an order entered on December 9, 2005 ("Employment Order"). With respect to Stopol's commission, the final decretal paragraph of the Employment Order provides as follows:

> [It is] ORDERED that Stopol be and is entitled to be paid a commission of (i) five percent (5%) of the gross proceeds of the sale of the Property at the Auction for its services and duties in conjunction with the Auction, and/or (ii) five percent (5%) of the gross proceeds of the sale of any item of Property pre-sold before Auction, whether at Private Sale or on-line, for its services and duties in conjunction with such sales for work performed pursuant to and in accordance with the Agreement and to be reimbursed expenses as provided in the Agreement pursuant to § 328(a) of the Bankruptcy Code without the necessity of further proceedings before this Court.

The live auction was to be conducted "without reserve" at the Debtor's facility in Durant, Oklahoma. Stopol's employees made several visits the Debtor's facility in order to prepare for the auction. Stopol also distributed a brochure to the public advertising the auction. According to the brochure, bidders would be required to pay a 10% "buyer's premium" if they purchased an item at the auction and a 15% "buyer's premium" if they purchased an item on-line.

Prior to the auction, Stopol attempted to sell some of the injection molding machines and other property listed in Exhibit "A" of the Sale Motion and Employment Application. Stopol also prepared a catalogue of the items it intended to sell at the auction and provided the list to the Debtor. The catalogue included molds and equipment

4

from Exhibit "A" as well as hundreds of smaller, miscellaneous items. On January 26, 2006, the Debtor sent Stopol a mark-up of the list in which the Debtor indicated numerous small items (such as dollies and ladders) that the Debtor had already sold or given away.

The items disposed of by the Debtor prior to the auction did not include any of the molds and equipment described in Exhibit "A" of the Sale Motion and Employment Application. However, Mr. Kruschke testified that it was his understanding that Stopol had been employed to sell *all* of the Debtor's property. Mr. Kruschke testified that he even marketed the Debtor's facility.

Prior to the auction, the Debtor learned that Stopol intended to charge a "buyer's premium." Mr. Mahalik repeatedly testified that Reggie Sullivan requested a "kickback" from Stopol. However, to the extent Mr. Sullivan discussed sharing a portion of Stopol's fees, it appears that Mr. Sullivan, as the representative of the Debtor, was seeking a rebate like the one offered by DoveBid.

On February 8, 2006, Stopol conducted an auction of the Debtor's property. Stopol has provided the Debtor and the Court with a detailed accounting of property sold prior to and at the auction. The records produced by Stopol show that Stopol, Inc. or its affiliate, Stopol Auctions, LLC, purchased numerous items from the Debtor, totaling

$3,545,000.[4] Mr. Kruschke testified that many of these items were purchased prior to the auction pursuant to the oral agreement between himself and Mr. Sullivan.

The records produced by Stopol also show that the Debtor submitted proxy bids for items totaling approximately $400,000. Mr. Sullivan testified that some of these items were attached to the Debtor's building, while others were necessary to facilitate the winding down of the Debtor. In contradiction of Mr. Sullivan's testimony, Mr. Mahalik testified that he helped Mr. Sullivan submit proxy bids on these items, because Mr. Sullivan did not want to sell the items for less than certain amounts.

Between the private treaty sales and the auction,[5] Stopol sold the Debtor's Property for a net total of $6,929,026.65, exclusive of the 10% buyer's premium charged by Stopol at the auction and the 5% commission approved by the Court. As of the hearing on the Motion to Compel, Stopol had collected $280,224.40 for the buyer's premium in connection with the sale of the Debtor's Property. The total amount of the 5% commission collected by Stopol in connection with the sale of the Debtor's property was $111,593.35.

In the original Motion to Compel, which was filed on March 13, 2006, the Debtor complained that Stopol refused to remit the buyer's premium to the Debtor. The Debtor also complained that Stopol had failed to pay the Debtor for items Stopol had committed

---

[4] Although neither the Debtor nor the liquidating trustee under the Plan brought an adversary proceeding against Stopol prior to the hearings on the Motion to Compel, the parties introduced evidence regarding an alleged breach by Stopol of its fiduciary duty to the Debtor. In particular, as stated above, Stopol purchased numerous items from the Debtor, totaling approximately $3,545,000. At the hearing on the Amended Motion to Compel, the Debtor alleged that Stopol failed to disclose to the Debtor that it had received purchase orders from third parties for several items prior to purchasing the items from the Debtor. Stopol, instead, purchased the items for itself and then resold them for a profit. At least one of the re-sales occurred at the auction itself. According to Stopol's accountant, Don Bonza, Stopol made more than $500,000 in profit from reselling the property purchased from the Debtor to third parties.

[5] Stopol did not conduct the on-line auction contemplated by the Auction/Liquidation Agreement.

6

to purchase for itself. Finally, the Debtor complained that Stopol had failed to provide a complete and detailed accounting of the auction to the Debtor.

On March 16, 2006, Stopol disbursed additional amounts to the Debtor. Stopol also provided the Debtor with additional information regarding the auction and private treaty sales. As a consequence, the Debtor amended its Motion to Compel, asserting that Stopol's accounting remains incomplete, that Stopol continues to hold some of the sales proceeds (including the buyer's premium and amounts due for equipment Stopol purchased for itself), and that Stopol has not disclosed the true sales prices of all of the property sold by Stopol. In the amended Motion to Compel, the Debtor also asserts that Stopol is not disinterested "and should be denied all compensation and punished for its conduct in this case."

Following the hearing on the Motion to Compel, William Herzog, in his capacity as liquidating trustee under the Plan (the "Trustee"), filed an adversary complaint against Stopol, Inc. and Stopol, LLC. In the Complaint, the Trustee asserts claims for breach of fiduciary duty, fraud, negligent misrepresentation, exemplary damages, breach of contract, attorneys' fees and disgorgement (the "Adversary Case") Additionally, in a statement filed on October 30, 2006 in connection with the Motion to Compel, the Trustee requested that the Court require the Debtor to escrow any funds the Court orders Stopol to disgorge pending a determination as to the ownership of the funds.

## II. DISCUSSION

### A. Compliance with FED. R. BANK. P. 7001

As an initial matter, Stopol argues that the Debtor is really seeking turnover in its amended Motion to Compel and that a request for turnover must be brought as an

7

adversary complaint. *See* 11 U.S.C. §542; FED. R. BANK. P. 7001(1). However, with respect to the buyer's premium and related fee disputes, the question is not turnover, but whether and to what extent Stopol should be required to disgorge its fees (including the buyer's premium) due to a violation of its duty of disclosure as a professional under 11 U.S.C. §327. Pursuant to 11 U.S.C. §105(a), the Court may take any action or make any determination necessary or appropriate to enforce or implement Court orders or rules.[6]

With respect to the Debtor's claim that Stopol engaged in self-dealing, the Court, having considered the testimony and evidence presented at the hearing on the Motion to Compel, notes that there may be a colorable claim for a breach by Stopol Auctions, LLC of its fiduciary duty to the estate and creditors. However, as Stopol pointed out at the hearing and in its objection to the Motion to Compel, this issue is not raised in the correct procedural posture to decide at this time. These and other claims against Stopol, Inc. and Stopol Auctions, LLC will be addressed in connection with the Trustee's pending Adversary Case.

### B. The Buyer's Premium

The retention of professionals is governed by §327 of the Bankruptcy Code and Bankruptcy Rule 2014. Section 327(a) provides in pertinent part that a debtor may employ an auctioneer or other professional that does not "hold or represent an interest adverse to the estate." The concept of an "adverse interest," which is not defined by the Bankruptcy Code, has sometimes been articulated in terms of motivation – that is,

---

[6] Moreover, turnover is not intended as a remedy to determine disputed rights of parties to property. *See, e.g., Marlow v. Oakland Gin Co., Inc. (In re Julien Co.),* 128 B.R. 987, 993 (Bankr. W.D. Tenn. 1991). In other words, actions to collect disputed amounts based upon state law contract principles do not fall within the scope of turnover actions. *See, e.g., In re Satelco*, 58 B.R. 781 (Bankr. N.D. Tex. 1986); *In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir. 1990) ("Turnover proceedings are not to be used to liquidate disputed contract claims.").

whether the professional possesses "a meaningful incentive to act contrary to the best interests of the estate and its sundry creditors." *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987); *see also In re Consolidated Bankshares,* 785 F.2d 1249, 1256 n. 6 (5th Cir. 1986) (adverse interest is one that "may engender conflicting loyalties").

The requirements of §327(a) are effectuated by Bankruptcy Rule 2014(a), which provides that the professional must disclose "any proposed arrangement for compensation" and all "connections with the debtor" to the Court. Section 328 of the Bankruptcy Code further provides that professionals may be retained "on any reasonable terms and conditions of employment." However, if the professional becomes interested or represents or holds an adverse interest at any time during the case, the Court may deny compensation. *See* 11 U.S.C. §328(c); *see, e.g., In re West Delta Oil Co., Inc.,* 432 F.3d 347 (5th Cir. 2005).

With respect to appraisers and auctioneers, Bankruptcy Rule 6005 requires that "[t]he order of the court approving the employment of an appraiser or auctioneer shall fix the amount or rate of compensation." Other professionals, in contrast, must file separate fee applications with the Court in order to be paid. Because Bankruptcy Rule 6005 obviates the need for appraisers and auctioneers to file fee applications in the same manner as other professionals, it is critically important that appraisers and auctioneers comply with the disclosure requirements of Bankruptcy Rule 2014(a) regarding their proposed compensation -- including disclosure by an auctioneer that the auctioneer intends to charge and retain a "buyer's premium." *See In re Remote Operating Sys., Inc.,* 238 B.R. 656, 658 (Bankr. N.D. Tex. 1999) (noting that if a buyer's premium is to be charged, the trustee's application to employ the auctioneer has to seek specific

9

authorization from the court); *Priddy v. First Nat'l Bank of Arvada (In re Rossmiller)*, 148 B.R. 326 (D. Colo. 1992) (finding that disclosure of a buyer's premium was required and failure to do so supported sanctions).

Here, the Employment Application made no mention of a "buyer's premium," nor does the Employment Order authorize the payment of a "buyer's premium" to Stopol.[7] Stopol, however, asserts that it is entitled to a "buyer's premium" based on language in the Auction/Liquidation Agreement requiring it to carry out the auction in accordance with its usual practices and procedures. The Court finds and concludes that this language is insufficient to satisfy Stopol's burden to disclose its total requested compensation to this Court in connection with the Employment Application – particularly where, as here, the key difference between the proposals by Stopol and DoveBid was the "buyer's premium" included in DoveBid's proposal. *See Rossmiller*, 181 B.R. at 990 (noting that the argument that a buyer's premium is a "tried-and-true-practice" supported the bankruptcy court's conclusion that the auctioneer acted in bad faith by failing to disclose the practice in connection with his application for employment).

Alternatively, Stopol argues that the "buyer's premium" is a separate contract between itself and the buyer to which the Debtor has no right or interest. Stopol compares the "buyer's premium" to sales taxes, both of which are paid by the purchaser. This argument, however, is inconsistent with the terms of the Auction/Liquidation Agreement. The Auction/Liquidation Agreement defines the "gross proceeds" of the auction to include "all revenue" from the sale of the Debtor's Property, except taxes. The

---

[7] Mr. Kruschke's affidavit in support of the Employment Application also did not disclose the alleged oral agreement between Mr. Kruschke and Mr. Sullivan pursuant to which Stopol would purchase certain assets from the Debtor. The Court finds that, if in fact there was such an agreement, it is unenforceable due to Stopol's failure to disclose the agreement to the Court.

10

"buyer's premium" is not excluded from the definition of "gross proceeds."

Furthermore, the Court is not persuaded by Stopol's argument that charging a "buyer's premium" had no effect on what the Debtor received for its property at the auction on February 8, 2006. "Simply stated, [a buyer's premium] is adding the sales commission as an obligation to the buyer after the bid." Leslie H. Miles, Jr., *Buyer's Premium*, 18 AM. BANKR. INST. J. 26 (October 1999). If an item of property was worth $110 to a potential bidder, the bid at the auction would have been for $100, and Stopol would have received $10 directly from the bidder. As other courts have recognized, "[a] 'buyer's premium' is indistinguishable from a direct charge to the estate by the auctioneer for his services." *In re Maropa Marine Sales Serv. & Storage, Inc.,* 92 B.R. 547, 548 (Bankr. S.D. Fla. 1988).

Finally, although Stopol was represented by counsel in connection with the Debtor's bankruptcy case, Stopol argues that it is the Debtor's fault (or the fault of counsel for the Debtor) that the "buyer's premium" was not included in the Employment Application. However, Bankruptcy Rule 2016(b) provides that it is the responsibility of the professional being employed by the Court to fully disclose its fee arrangements. Stopol knew that it intended to collect a "buyer's premium" as part of its ordinary practices and procedures. Had Stopol disclosed this intent to the Court, rather than silently taking the position that the "buyer's premium" was not relevant to its employment by the Debtor, the Court could have fully evaluated the request to employ Stopol.[8] Stopol – not the Debtor – deprived the Court and creditors of this opportunity.

---

[8] In fact, it seems unlikely the Debtor would have selected Stopol's proposal over DoveBid's if Stopol had disclosed its intent to charge a "buyer's premium." DoveBid's proposal was to be compensated by a 9.5% "buyer's premium." Stopol, in contrast, seeks to be compensated by a 10% "buyer's premium" in addition to 5% of bid prices.

### C. The Employment Order

In addition to the dispute regarding the "buyer's premium," the parties disagree about whether Stopol is authorized to collect a commission on (1) items sold by the Debtor prior to the auction; (2) "purchases" made by the Debtor at the auction; and (3) post-auction sales by the Debtor.

#### *1. Pre-Auction Sales by the Debtor*

As a preliminary matter, this Court's Employment Order does not grant Stopol authority to sell _all_ assets of the Debtor. Rather, the Employment Order authorizes Stopol to sell the Debtor's "Property," as that term is defined in the Employment Application. The Employment Application defines the term "Property" to include _certain_ assets of the Debtor -- specifically, the molds and equipment listed on the attached Exhibit "A" "along with other miscellaneous items of property such as furniture and computers _as the Debtor may direct_." (Emphasis added.) Paragraph 1(B) of the Auction/Liquidation Agreement likewise refers to an Exhibit "A" when defining the equipment and assets to be sold by Stopol, and the Auction/Liquidation Agreement allows the Debtor to direct Stopol to sell additional items.

Stopol's argument that it is entitled to a commission on all sales of the Debtor's assets appears to be based on Mr. Kruschke's testimony that Mr. Sullivan directed him to sell all of the Debtor's assets. Stopol, therefore, asserts that it was authorized to sell all of the Debtor's assets pursuant to the Auction/Liquidation Agreement and the Employment Order. Paragraphs 1(B) and 1(C) of the Auction/Liquidation Agreement authorize Stopol to sell the Debtor's Property (*i.e.*, all of the Debtor's assets, according to Stopol) "on an exclusive basis." Additionally, Paragraph 2(A) of the Auction/Liquidation Agreement

12

prohibits the Debtor from selling its Property (*i.e.*, all of the Debtor's assets, according to Stopol) without Stopol's express written consent.

Even assuming that the Court accepts Mr. Kruschke's testimony as true, this Court's Employment Order does not entitle Stopol to a commission on sales actually made by the Debtor. The Auction/Liquidation Agreement and the Employment Application provided the Debtor with discretion to decide whether to allow Stopol to sell items other than those listed in Exhibit "A" to the Auction Liquidation Agreement and the Employment Application. The Employment Order provides that Stopol will receive a 5% commission on sales "for its services and duties in connection with such sales." If the Debtor, not Stopol, sold an item of property, then the commission set forth in the Employment Order clearly does not apply to that sale.

### *2. Proxy Bids by the Debtor at the Auction*

Stopol asserts that it is entitled to a commission on all "sales" to the Debtor at the auction. However, an auctioneer is an agent of the owner, and a consummated sale to a third party is generally required as a pre-requisite for payment of a commission to the auctioneer. *See* 7 AM. JUR. 2d Auctions and Auctioneers §73; Francis M. Doughtery, *Auctioneer's Action for Commissions against Seller*, 38 A.L.R.4th 170 (1985) (collecting cases). In this case, neither the Employment Order nor the Auction/Liquidation Agreement provides that Stopol is to receive a commission on "sales" to the Debtor.

Although the Court has found few cases addressing an owner's decision to remove property from the auction by bidding on it, one court has held that

> if an owner bids on his own property at a public auction sale to protect his own interests, and his bid is last and highest, and he thereby prevents the consummation of a sale with a third person, he can be compelled by the

13

> auctioneer to pay the commission contracted to be paid for conducting the sale.

*Hayes v Hannah,* 5 S.E.2d 782 (Ga. Ct. App. 1940). In other words, an auctioneer may be entitled to a commission when it fulfills its part of the auction contract by procuring a purchaser, despite the fact the seller for some reason refuses to consummate the sale. *See* 7 AM.JUR. 2d *Auctions and Auctioneers* § 75 (collecting cases regarding entitlement to commission in absence of sale). Here, to the extent Stopol asserts that the Motion to Compel should be denied because Stopol is entitled to a commission based on this or a similar form of equitable estoppel, Stopol's claimed fees fall outside the scope of the Employment Order and the compensation scheme set forth in the Employment Order.

### 3. *Post-Auction Sales by the Debtor*

Finally, with respect to post-auction sales, Stopol argues that Paragraph 1(C) of the Auction/Liquidation Agreement gives it the exclusive right to sell all property of the Debtor for six months from the date of the Auction/Liquidation Agreement. Thus, Stopol asserts that the Debtor has a contractual obligation to pay Stopol for any items sold by the Debtor during that time period.

As the Court has previously discussed, Bankruptcy Rule 6005 requires that an order approving the employment of an auctioneer must also fix the amount or rate of compensation. In this case, the Employment Order does not authorize Stopol to collect a commission on post-auction sales. The Employment Order only allows Stopol to collect a commission on sales of "Property" (as defined in the Employment Application) at or prior to the auction.

Notably, the Employment Application made no mention of an exclusive right to sell all assets of the Debtor following the auction. Mr. Kruschke also made no mention

of such a right in his testimony before this Court on December 1, 2005. To the contrary, Mr. Kruschke testified that it was his hope to pre-sell most of the Debtor's property. When asked what Stopol's compensation would be under the Auction/Liquidation Agreement, Mr. Kruschke testified "five percent." Hrg. Tr., Dec. 1, 2005, at page 89.

All material terms of Stopol's employment should have been set forth in the Employment Application and disclosed to the Court at the hearing on Stopol's employment. The Court believed the parties' representations regarding the terms of Stopol's employment to be accurate. The Court assumes that the parties did not intend to mislead it by failing to make any mention of a term so obviously material as an exclusive right to sell all assets of the Debtor for six months following the execution of the Auction/Liquidation Agreement. However, as a result of the parties' failure to fully disclose their agreement to this Court, the Employment Order does not authorize Stopol to collect a commission on post-auction sales. To the extent Stopol opposes the Motion to Compel on the grounds that it is owed a commission or expenses for post-auction sales, Stopol's opposition is overruled.

## CONCLUSION

For the forgoing reasons, the Court finds and concludes that the Debtor's Motion to Compel should be granted in part. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings as necessary or as requested by any party.

**IT IS THEREFORE ORDERED** that Stopol shall disgorge and remit to the Debtor any "buyer's premium" it has collected in connection with sales of the Debtor's property.

**IT IS FURTHER ORDERED** that Stopol shall disgorge and remit to the debtor any fees retained on account of post-auction sales of the Debtor's property.

**IT IS FURTHER ORDERED** that the Debtor shall place the funds disgorged by Stopol into escrow pending a determination of the ownership of the funds.

**IT IS FURTHER ORDERED** that the remaining claims of the Debtor or Trustee against Stopol for fraud, negligence, negligent misrepresentation, breach of fiduciary duty, breach of contract, exemplary damages, attorneys fees and disgorgement shall be addressed in the pending Adversary Case.

**IT IS FURTHER ORDERED** that, except as set forth herein, the Debtor's *Expedited Motion to Compel Stopol to Disburse Sale Proceeds and Provide Accounting* and the Debtor's *Amended Expedited Motion to Compel Stopol to Disburse Sale Proceeds and Provide Accounting* shall be, and are hereby, **DENIED**.

Signed on 3/16/2007

_Brenda T. Rhoades_ MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE